UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON


CIVIL ACTION NO. 09-358-GWU


PHYLLIS SMITH,                                                    PLAINTIFF,


VS.                          **MEMORANDUM OPINION**


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                   DEFENDANT.


## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of her application for Supplemental Security Income (SSI).  The appeal is

currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation

process in assessing whether a claimant is disabled.

1. Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2. If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities?  If not, a finding of non-disability is made and the claim is denied.

3. The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of

Impairments).  If so, disability is conclusively presumed and benefits are awarded.

4.      At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

5.      If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence.  Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician

than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim.  Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982).  This presumes, of course, that the treating physician's opinion is based on objective medical findings.  Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987).  These have long been well-settled principles within the Circuit.  Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain.  Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms.  20 C.F.R. § 404.1529 (1991).  However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work.

4

Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having

5

the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

**DISCUSSION**

The plaintiff, Phyllis Smith, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of osteoporosis/osteopenia, a history of seizures, a history of blood clots, and pains of the back and knees.  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that the plaintiff retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits.  (Tr. 12-18).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age of 45, high school education, and unskilled work experience could perform any jobs if she were limited to lifting 25 pounds frequently and 50 pounds occasionally, standing and/or walking about six hours in an eight-hour day, sitting six hours in an eight-hour day, with a need to change positions for 10 minutes after every hour of continuous standing or sitting and a need to keep the left leg elevated if sitting longer than 30 minutes.  (Tr. 45).  Additionally, she was limited to no climbing of ladders, ropes, or scaffolds, could not kneel, crouch, or crawl, and could only occasionally climb stairs or push and pull with the left lower extremity.  Finally, she could have no exposure to hazards such as heights and dangerous machinery or to vibration.  (Id.).  The VE responded that the "medium" level exertion in the hypothetical question was not compatible with a change of positions every hour, but there would be "light" level jobs for such a person, and he proceeded to identify

them and give the numbers in which they existed in the state and national economies.  (Tr. 45-7).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.  There is an additional issue in that the plaintiff had previously applied for benefits, and had been denied in another ALJ decision on September 22, 2005.  The plaintiff's current SSI application was filed on August 22, 2006, and the ALJ evaluated the plaintiff's condition from that date forward.  (Tr. 8).

The plaintiff alleged disability due to seizures, a history of blood clots, and back and knee problems, all of which predated her current SSI application.  (Tr. 128).  At the time of the January 10, 2008 administrative hearing, she testified that she was prescribed Phenobarbital for her seizures, and had suffered a spell a month before.  (Tr. 25-6).  Before that, however, it had been one year since her previous seizure.  (Tr. 26).  She did not drive, but testified that she had never had a license.  (Tr. 27).  She also admitted that her seizure problem had been present for many years, and had not prevented her from working, although she alleged that the problem had become worse in the previous two or three years.  (Tr. 34).  The Phenobarbital made her sleepy and lethargic.  (Tr. 35).

The plaintiff testified that her problem with blood clots in the legs had prevented her from working, and she was on a blood thinner, Coumadin, and had to have her blood checked weekly at a hospital.  (Tr. 27, 34).  No blood clots had

been found, but her leg would swell when she stood for an hour at a time, and become painful.  (Tr. 27-8).  Finally, she had severe back pain which was untreated, and stated that she could only sit 5 or 10 minutes without pain.  (Tr. 29, 33).  In a normal day, she had to lie down or elevate her leg an hour at a time four or five times a day.  (Tr. 38).

Records prior to the period covered by the current application show that the plaintiff had a seizure in December, 2005, but her medication level was low.  (Tr. 216, 231).  After her medication was changed, she reported on August 2, 2006 that she had not had a seizure since the previous March.  (Tr. 238).  An electroencephalogram (EEG) in March, 2006 was read as abnormal (Tr. 233), but on August 14, 2006 another EEG was interpreted as normal (Tr. 274).  One of her treating physicians, Dr. Alam Khan, indicated in December, 2006 that the plaintiff's epilepsy was under "fair" control on medication.  (Tr. 277).  Another office note from Dr. Khan in January, 2008 stated that the plaintiff had one small breakthrough spell two months previously, but her neurological examination was normal.  (Id.).

Dr. Robert Hoskins, who treated the plaintiff on several occasions, conducted a disability evaluation in October, 2006.  At that time, she reported her last seizure episode was six to seven months previously, and the problem was under control with current medications.  (Tr. 244).  She described a history of thrombosis in the left leg with occasional mild swelling.  (Id.).  She also described back pain which was worsened by lifting, bending, and standing.  (Id.).  Dr. Hoskins's examination

showed that the plaintiff weighed 184 pounds at a height of 4 feet 9 inches.  Her left leg had "2+ pitting brawny edema with cyanosis and several moderate varicosities." (Tr. 245).  The right leg had 1+ pitting edema, and the right calf measured only 14.75 inches compared to 17 inches for the left calf.  (Id.).  The plaintiff was able to bend forward 70 degrees, had a normal gait, could tandem, toe, and heel walk, and had unremarkable sensation and reflexes.  (Id.).  Dr. Hoskins reviewed a lumbrosacral spine x-ray showing severe compression fractures at three levels, osteopenia and probable osteoporosis, mild to moderate degenerative joint disease and probable degenerative disc disease, and moderate kyphosis.  (Tr. 249).

Dr. Hoskins provided some limitations, including a specific recommendation that the plaintiff should avoid activities that had increased risk of injuries because of the risk of bleeding, and he also recommended that the plaintiff needed to elevate her left leg and not sit for "extended" periods.  He noted that she was not "fit for heavy lifting, heavy labor [or] frequent stooping, bending[,] squatting and crawling."  He felt that her musculoskeletal limitations would "impair standing, walking, carrying, light lifting or some bending, squatting, crawling, climbing or balancing."  (Tr. 246).

State agency physicians Allen Dawson and Amanda Lange reviewed the record on November 1, 2006 and February 7, 2007, respectively, and opined that the plaintiff was capable of lifting up to 50 pounds occasionally and 25 pounds frequently, would need a 10 minute position change for every hour of continuous

standing or sitting, would need to keep her left leg elevated if sitting longer than 30 minutes, could "occasionally" push and pull with the left leg, could occasionally climb ramps and stairs, could never climb ladders, ropes, or scaffolds, needed to avoid concentrated exposure to vibration, and avoid all exposure to hazards.  (Tr. 252-8, 405-12).   These findings were consistent with the ALJ's hypothetical question.

Subsequently, Dr. Khan, a treating source, submitted a "Seizure Residual Functional Capacity Questionnaire" dated December 11, 2007.  (Tr. 530).  Dr. Khan gave the plaintiff's diagnosis as "seizure disorder," with the dates of the last three seizures being December 2005, March 2006 and December 2006.  (Id.).  He stated that the average frequency of the seizures was "unknown."  (Id.).  He also stated that the plaintiff had had a good response to the medication Tegretol, although it had lethargy and lack of alertness as side effects.  (Tr. 531-2).  He stated that the plaintiff would have to lie down at unpredictable intervals, needed more supervision than average, and was likely to disrupt the work of others.  (Id.).  Finally, he opined that the plaintiff would have "poor or no" ability to deal with stress even in low stress jobs, to get to work on time, to have her work performance supervised, to remain in the workplace for a full day and to deal with coworkers and supervisors appropriately.   The basis for this opinion was simply the uncertainty of having seizures.  Finally, he opined that the plaintiff would be absent from work more than three times a month.  (Tr. 533).

A subsequent office note from Dr. Khan dated January 7, 2008 indicates that the plaintiff had a "breakthrough small spell" two months ago, despite a Tegretol level of 5.7 mg/dl.  (Tr. 528).[1]  She was also complaining of a headache.  The physician ordered an increase in the medical dosage, stated that he discussed driving precautions and the side effects of medications, and concluded "patient is in no condition to return to work, or get any gainful employment, and should be considered disabled."  (Tr. 529).

Other evidence subsequent to the opinions of the state agency physicians included an MRI of the lumbrosacral spine showing an "old" compression deformity of the T12 vetrebra and disc dessication at L5-S1 (Tr. 432, 466), a CT scan of the abdomen which appeared to be abnormal but did not show definite gallstones (Tr. 448), and a venous ultrasound of both legs showing no evidence of deep venous thrombosis (Tr. 455).  No physician appears to have suggested any functional restrictions based on these or other findings.

The plaintiff objects that the ALJ improperly rejected the opinions of Dr. Hoskins and Dr. Khan.  Generally, the opinion of a treating source is entitled to substantial weight, and may be entitled to controlling weight if it is supported by substantial evidence and not inconsistent with other evidence in the record.  Harris

---

[1]The therapeutic range for Tegretol is between 4 and 12 mg/dl.  Novartis Pharmaceuticals Corporation website, www.pharma.us.novartis.com/product/pi/pdf/tegretol.pdf (last visited August 10, 2010).

v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).  If the treating physician opinion is not given controlling weight, the Commissioner's regulations provide that the ALJ must consider a number of factors to determine how much weight is appropriate, including the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and any specialization of the treating physician.  20 C.F.R. § 404.1527(d)(2).  An ALJ is required to give "good reasons . . . for the weight" given to the treating source opinion.  Wilson v. Commissioner of Social Security, 378 F.3d 541, 544 (6th Cir. 2004), citing 20 C.F.R. § 404.1527(d)(2).

The ALJ declined to accept the limitation given by Dr. Khan in the December 11, 2007 form, citing various grounds.  First, he stated that the limitations appeared to be "precautionary and based upon the claimant's self-reports."  He felt that they were not well supported by the physician's treatment notes.  Specifically, the ALJ believed it was inconsistent to say that the plaintiff would be absent for more than three times per month in view of the fact that she had not had a seizure in a year, and had only three seizures in the past two years.  The physician also indicated that he did not know how many seizures the plaintiff had per week and per month, and that she was having a "good" response to Tegretol.  The ALJ did not believe that the evidence supported a conclusion that the plaintiff had to lie down at unpredictable

intervals, asserting that the plaintiff did not say anything about lying down frequently during the daytime at the administrative hearing.  (Tr. 16).

On the last point, the plaintiff's testimony is ambiguous.  She was asked by her attorney "in a normal day how long are you lying down or elevating your leg?" and responded "a hour or two."  (Tr. 38).  Subsequent questioning concerned only how often the plaintiff had to elevate her leg, but the first question could be interpreted as addressing the need to lie down.  (Id.).  This ground for discrediting the treating physician is therefore somewhat tenuous.  Moreover, the form does not literally state that the plaintiff's seizures would cause her to be absent more than three times a month; rather, it asks how often "the patient's impairment(s) <u>or treatment</u> would cause" absences (emphasis added).  (Tr. 533).  Dr. Khan had also indicated that the side effects of the medication were lethargy and lack of alertness (Tr. 532), which was consistent with the plaintiff's testimony (Tr. 35) and could by itself explain the reason for expected absenteeism.  Finally, there is no indication in the hearing decision that the ALJ considered all of the subsequent office note from Dr. Khan indicating another seizure, albeit light, and the physician's reiteration that the plaintiff was "disabled" and not able to hold a job.  While conclusory disability opinions represent vocational conclusions outside a physician's area of expertise, the failure to even mention a treating source opinion cannot be considered harmless error.  <u>Bowen v. Commissioner of Social Security</u>, 478 F.3d

742, 748 (6th Cir. 2007).  Also of note, the ALJ does not appear to have given any specific consideration to Dr. Khan's specialty as a neurologist.

Concerning Dr. Hoskins, the ALJ summarized his opinion as prohibiting " . . . heavy lifting, heavy labor, frequent stooping, bending, squatting, and crawling," in addition to needing to elevate her left leg and avoid sitting for extended periods. (Tr. 11).  Not mentioned was the physician's statement that her musculoskeletal limitations "will impair . . . light lifting . . . ."  (Tr. 246).  While not worded in a definitive manner, the ordinary interpretation of this statement is that the plaintiff had an impaired ability to perform even the "light" lifting required for jobs discussed in the VE's testimony.

For these reasons, a remand will be required for further consideration.  The plaintiff has also submitted additional evidence to the Appeals Council.  While the new evidence cannot be considered as part of the court's substantial evidence review, it can be considered along with other new evidence on the remand.

The decision will be remanded for further consideration.

This the 11th day of August, 2010.

**Signed By:**

**_G. Wix Unthank_**

**United States Senior Judge**